[Cite as *Fagan v. Shelby*, 2025-Ohio-2648.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| DAWN FAGAN, et al., | : | JUDGES: |
| | : | Hon. Andrew J. King, P.J. |
| Plaintiffs - Appellants | : | Hon. Robert G. Montgomery, J. |
| | : | Hon. David M. Gormley, J. |
| -vs- | : | |
| | : | |
| CITY OF SHELBY, et al., | : | Case No. 2024 CA 0061 |
| | : | |
| Defendants - Appellees | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Appeal from the Richland County
Court of Common Pleas, Case No.
2023 CV 0043 R

JUDGMENT:     Affirmed

DATE OF JUDGMENT:     July 23, 2025

APPEARANCES:

For Plaintiffs-Appellants

JOHN C. CAMILLUS
P. O. Box 141410
Columbus, OH 43214

For Defendants-Appellees,
City of Shelby and Jerry Marshall

FRANK H. SCIALDONE
JOHN D. PINZONE
EDMOND Z. JABER
Mazanec, Raskin & Ryer Co., LPA
34305 Solon Road
Cleveland, OH 44139

For Defendants-Appellees,
Advantage Staffing LTD, dba Staffing
  Partners, PGF Limited Partnership
  dba Staffing Partners and
  William Bland

ANDREW D. JAMISON
BRIANNA M. PRISLIPSKY
VICTORIA L. NEIKAM
REMINGER CO., LPA
200 Public Square, Suite 1200
Cleveland, OH  44115

*Montgomery, J.*

**{¶1}** Plaintiffs-Appellants appeal from the Richland County Court of Common Pleas granting Defendants-Appellees' motions for summary judgment. For the following reasons, we affirm.

<u>**STATEMENT OF THE CASE**</u>

**{¶2}** This appeal stems from a Complaint filed on January 27, 2023, by Appellants, Dawn and Frederick Fagan, individually and on behalf of their minor son, C.F. While C.F. was on a school field trip at Seltzer Park, operated by the City of Shelby, Ohio, he went to use the park's south restroom. C.F.'s mom waited outside. After washing his hands, he used the hand dryer attached to the wall in the restroom. Tragically, and unbeknownst to C.F., the protective guard that covered the dryer's internal fan was missing, and C.F.'s hand caught in the fan, causing significant injury to several fingers, including amputation of his index finger.

**{¶3}** Appellants' Amended Complaint asserts five claims for relief: (1) premises liability/negligence against the City of Shelby ("City"); (2) recklessness against Jerry Marshall ("Marshall"), the City's Park Superintendent for 19 years; (3) negligence against William Bland ("Bland"), a maintenance man who reinstalled/reattached the hand dryer at issue; (4) respondeat superior against Advantage Staffing LTD, dba Staffing Partners and PGF Limited Partnership dba Staffing Partners ("Staffing Partners"), the temporary staffing agency who contracted with the City to provide workers; and (5) loss of consortium against all of them.

**{¶4}** On February 1, 2024, the City and Marshall filed a motion for summary judgment and on February 7, 2024, Bland and Staffing Partners filed a separate motion

for summary judgment.  On August 8, 2024, the trial court granted summary judgment and dismissed Appellants' claims in their entirety.  In ruling on said motions, the court considered the entire record – pleadings, motions for summary judgment and all related responses and replies, depositions, interrogatories and admissions, and all relevant case law and statutory law.

{¶5}    In a very detailed decision, the trial court found as follows: (1) the City, a political subdivision, enjoyed common law derivative "recreational user immunity;" (2) Marshall, as the City's employee, was also entitled to recreational user immunity; (3) the City was Bland's "employer" such that Staffing Partners was not liable for Bland's alleged negligence pursuant to the borrowed servant doctrine; (4) because the City enjoyed immunity, it could not be held liable for Bland's alleged negligence.  The court reasoned that while a "political subdivision" does not have direct statutory immunity as defined in R.C. 1533.18, et seq., it has common law derivative immunity to recreational users of public land.

{¶6}    The trial court followed the Ohio Supreme Court's guidance to utilize the recreational user statute and apply the same standard of liability for both public and private landowners - thereby extending the recreational user immunity to political subdivisions.  Contrary to Appellants' argument that R.C. Chapter 2744 exclusively controlled the City's liability and/or immunity, the trial court determined that both R.C. Chapter 2744 and the recreational user statutes provide overlapping immunity and serve the same purpose, namely, to limit taxpayers' exposure to liability.  The trial court emphasized R.C. Chapter 2744.03(A)(7)'s express language conferring both common-law and statutory immunity on political subdivisions. The trial court thus applied derivative

recreational user immunity to the City, Marshall, and ultimately Bland. Appellants timely filed an Appeal.

## BACKGROUND FACTS

{¶7} The trial court found the following undisputed facts. On or about April 23, 2022, the south restroom at Seltzer Park was vandalized. The City's law enforcement personnel contacted Superintendent Marshall to assess the damage.[1] As a result of the vandalism, the hand dryer at issue was pulled away about six inches from the wall. Marshall locked the bathroom due to the extent of the overall damage. On April 25, 2022, Marshall instructed Bland and another employee with Staffing Partners, Rich Chew ("Chew"), to clean up the restroom, install a new paper towel holder, a new soap dispenser, and reattach the hand dryer to the wall.

{¶8} Bland reattached the hand dryer to the wall while Chew cleaned up the restroom. To reattach the hand dryer, the cover was removed, the anchor was refastened to the wall, the base of the hand dryer was reattached, and then the cover was affixed. Bland ran his hands under the hand dryer to ensure it worked, but he did not inspect the hand dryer for any missing pieces. Neither Bland nor Marshall had specific knowledge that the dryer had a protective cover or that such cover was missing. Bland did not compare the hand dryer in the men's restroom to the hand dryer in the women's restroom.

{¶9} Marshall later inspected the men's restroom to ensure it was safe and orderly to open but did not look under the hand dryer to see if the safety guard was present on the hand dryer (again, he did not know it was missing). Marshall did not instruct Bland or Chew to look underneath the hand dryer for the safety guard. Marshall also did not

---

[1] Marshall reports to the park board. At the time of C.F.'s incident, all other employees were contracted through Staffing Partners.

look in the women's restroom to compare the two hand dryers.  On May 6, 2022, a new sink arrived and was installed in the men's restroom although not entirely hooked up and working.  On May 9, 2022, the new sink was vandalized, and the restroom was briefly closed again.  The mess was cleaned up and the men's restroom was opened that evening or the morning of May 10, 2022.

{¶10}  On May 10, 2022, C.F. was in first grade at Sacred Heart elementary school in Shelby, Ohio. On the same date, C.F. and his mother attended a school field trip that began at Milliron Recycling and ended at Seltzer Park in Shelby, Ohio. Permission slips were required to attend but there was no cost associated with the field trip. C.F.'s mother attended the field trip as a chaperone.

{¶11}  After lunch, C.F. went to use the restroom while his mom waited outside a few feet away.  A couple of minutes passed, and C.F. came running out of the restroom screaming and holding up his hand.  C.F. had injuries to his index, middle, and ring finger on his left hand.  C.F.'s mom put a wet paper towel around C.F.'s hand and applied pressure.  She then decided to drive C.F. to the Ohio Health emergency room located in Shelby, Ohio because it was faster than waiting for an ambulance.  Per doctor's recommendation, C.F. was moved to Akron Children's Hospital in Akron, Ohio.  C.F. underwent two surgeries at Akron Children's Hospital and ultimately, his left index finger was amputated.  Mrs. Fagan's understanding of the incident is that when C.F. dried his hands with the hand dryer, there was no safety guard on the underside to prevent his hands from reaching the fan inside.  Essentially, the blades from the dryer fan sliced off C.F.'s fingers.

**{¶12}** Marshall received a phone call from the police informing him of the incident. Upon arrival at Seltzer Park, Marshall learned that a boy got his hand stuck in the hand dryer's fan and seriously injured his fingers. Marshall learned that the protective guard covering the dryer's fan was missing.[2] Importantly, the record is devoid of any evidence as to how or when the protective guard went missing. Appellants suggest the vandalism may have knocked the protective guard off, and that someone was negligent in failing to ensure that it was properly reattached.

## ASSIGNMENT OF ERROR

**{¶13}** "I. THE TRIAL COURT ERRED BY GRANTING APPELLEES' MOTIONS FOR SUMMARY JUDGMENT."

## SUMMARY JUDGMENT STANDARD OF REVIEW

**{¶14}** Summary judgment proceedings present the appellate court with the unusual opportunity of reviewing the evidence in the same manner as the trial court. *Smiddy v. The Wedding Party, Inc.*, 30 Ohio St.3d 35, 36 (1987). Accordingly, this Court reviews a trial court's award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996).

**{¶15}** Civ. R. 56(C) states in pertinent part: "Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ... A summary judgment shall not be

---

[2]The hand dryer was originally installed in May 2021. However, neither Marshall nor Bland installed the dryer. The City outsourced the installation given the electrical installation requirements of the hand dryer. After the installation, Marshall checked to ensure the hand dryer was operating properly.

rendered unless it appears from such evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor."

{¶16} Thus, summary judgment may be granted only after the trial court determines that: 1) no genuine issues as to any material fact remain to be litigated; 2) the moving party is entitled to judgment as a matter of law; and 3) it appears from the evidence that reasonable minds can come to but one conclusion and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317 (1977).

{¶17} Summary judgment consists of a burden-shifting framework. *Dresher v. Burt,* 75 Ohio St.3d 280, 294 (1996). The movant bears the initial burden of demonstrating the absence of genuine issues of material fact concerning the essential elements of the nonmoving party's case. Once this burden is met, the burden shifts to the nonmoving party. *Id*. According to Civ.R. 56(E), the nonmoving party may not rest on mere allegations or denials in their pleadings but must set forth specific facts showing a genuine issue for trial. *Id.* at 293. A fact is "material" only if its resolution will affect the outcome of the lawsuit. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).

{¶18} As stated above, the trial court specifically found that although the City and Marshall did not have direct statutory immunity under R.C. 1533.181, they did enjoy derivative recreational user immunity. The court rejected Appellants' argument that

R.C. Chapter 2744 exclusively controlled the matter and found that R.C. Chapter 2744 and R.C. 1533.18 are both designed to provide significant immunity to political subdivisions that open their public land to recreational users. The court further found that Bland was a "borrowed servant" under the City's exclusive control and was entitled to the same immunity. Because Bland was immune, there was no liability to impute to Staffing Partners under the theory of "respondeat superior."

## ANALYSIS

### *Recreational User Immunity Statute*

{¶19} R.C. 1533.181 is entitled "Exemption from liability to recreational users" and is commonly referred to as the recreational user immunity statute. The statute provides:

> (A) No owner, lessee, or occupant of premises (1) Owes any duty to a recreational user to keep the premises safe for entry or use; (2) Extends any assurance to a recreational user, through the act of giving permission, that the premises are safe for entry or use; (3) Assumes responsibility for or incurs liability for any injury to person or property caused by any act of a recreational user.

{¶20} Subsection (B) states that the immunity defense "applies to the owner, lessee, or occupant of privately owned, nonresidential premises, whether or not the premises are kept open for public use and whether or not the owner, lessee, or occupant denies entry to certain individuals." R.C. 1533.18 defines "premises" and "recreational user" as follows:

> (A) "Premises" means all privately owned lands, ways, and waters, and any buildings and structures thereon, and all privately owned and state-owned

lands, ways, and waters leased to a private person, firm or organization, including any buildings and structures thereon;

(B) "Recreational user" means a person to whom permission has been granted, without the payment of a fee or consideration to the owner, lessee, or occupant of premises, other than a fee or consideration paid to the state or any agency of the state, or a lease payment or fee paid to the owner of privately owned lands, to enter upon premises to hunt, fish, trap, camp, hike, or swim, or to operate a snowmobile, all-purpose vehicle, or four-wheel drive motor vehicle, or to engage in other recreational pursuits.

**{¶21}** The purpose and intent of the recreational user immunity statute is to encourage owners of premises suitable for recreational pursuits to open their land for public use without worry of liability. *Moskalik v. Mill Creek Metroparks*, 2015-Ohio-4826, ¶ 13, quoting *Moss v. Ohio Dept. of Natural Resources*, 62 Ohio St.2d 138, 142 (1980). Ohio courts have construed the statute broadly to achieve said purpose. *Price v. New Madison*, 2d Dist. Darke No. 1348, ¶ 7 (Oct. 26, 1994); citing *Marrek v. Cleveland Metroparks Bd. of Commrs.*, 9 Ohio St.3d 194, 198 (1984).

**{¶22}** The existence of immunity does not depend upon the specific activity pursued by the recreational user at the time of the user's injury. *Miller v. City of Dayton*, 42 Ohio St.3d 113, 115 (1989). Rather, the analysis must focus on the "character of the property" upon which the injury occurs, and the type of activities for which the property is held open to the public. *Id.* at 114. If the premises qualify as being open to the public for recreational pursuits, the statute does not require that a distinction be made between users depending upon the activity at the time of injury. *Id.* at 115.

**{¶23}** Moreover, the property need not be completely natural, but its essential character should fit within the intent of the statute. *Id.*; *Farris v. Mill Creek Metropolitan Park District*, 2023-Ohio-1214, ¶ 14 (7th Dist.). Statutory immunity applies if the characteristics of the "premises," viewed as a whole, are consistent with the purpose of use envisioned by the legislature in its grant of statutory immunity, and the question is whether users use the premises to "hunt, fish, trap, camp, hike, swim, or engage in other recreational pursuits." *Miller, supra*, at 115. Ohio courts have extended the definition of "recreational pursuit" to include kite flying, sledding, horseback riding, bicycle riding, attending a softball game, and using playground facilities. *Hubbard v. City of Norwood*, 1995 WL 734053, at *1 (1st Dist.).

**{¶24}** The Supreme Court of Ohio has expressly applied the recreational user statute to premises owned by political subdivisions such as cities and state parks. See *Moss v. Dept. of Natural Resources*, 62 Ohio St.2d 138 (1980) (applying statute to state park); *Marrek,* 9 Ohio St.3d 194 (1984) (holding that the recreational user statute providing that no owner owes any duty to recreational user to keep premises safe for entry or use applies same standard of liability for both public and private landowners; thus, park district did not owe any duty to recreational user to keep premises safe for entry or use where sledder was gratuitous user of park property and entered premises for recreational pursuit); *LiCause v. Canton,* 42 Ohio St.3d 109 (1989), syllabus, citing to *Johnson v. New London,* 36 Ohio St.3d 60 (1988); *Pauley v. City of Circleville,* 2013-Ohio-4541.[3] "Political subdivision" ordinarily includes counties, cities, townships, park

---

[3] As aptly set forth in *Tomba*, "[t]his statutory immunity originally applied by its terms to private landowners only. The immunity was later extended to political subdivisions by virtue of the Ohio Supreme Court's abolishment of sovereign immunity for political subdivisions, in which the Supreme Court made political subdivisions liable for torts "to the same extent" as private parties.

districts, and school districts, among other things. See *Farris*, ¶ 13 (holding that injured bicyclist was a "recreational user" and park district was entitled to derivative immunity). Thus, the recreational user statute applies the same standard of liability for both public and private landowners including political subdivisions. *Marrek,* at 197-98.

{¶25} For example, in *Miller*, the city of Dayton owned and operated a softball field upon which a player was injured during a softball game. *Miller*, supra, 42 Ohio St.3d 113. The primary issue was whether the plaintiff was a recreational user. The court answered affirmatively and held that the city was entitled to derivative recreational user immunity stating, "[r]ecreational-user immunity attaches to property owners who hold their property open for recreational use to the general public without the payment of a fee or other consideration." *Id*. at 116, citing *Sorrell v. Ohio Dept. of Natural Resources*, 40 Ohio St.3d 141 (1988). The *Miller* court concluded that despite manmade improvements, such as a baseball diamond, the essential character of the property remained an outdoor space used for an outdoor recreational activity. *Miller*, 42 Ohio St.3d 113.

{¶26} More recently, the Ohio Supreme Court applied common law derivative recreational user immunity to the city of Circleville in *Pauley*, supra. In that case, an eighteen-year-old boy was paralyzed while sledding with his friends in a city park. Before the winter snowfall, the city had placed 150 to 200 truckloads of topsoil and construction debris in the park creating a large mound that proved to be an attractive sledding hill. A group of teenagers climbed said hill and the plaintiff was paralyzed when he struck "an

---

Thus, since private parties were immune from liability when the recreational user statute applied, political subdivisions had the same immunity. However, unlike the private landowners who were protected by the statute directly, political subdivisions were protected derivatively." *Tomba v. City of Wickliffe*, 114 Ohio Misc.2d 10, 13 (2001).

immovable object" in the debris pile. *Pauley*, ¶¶ 35-37. The Plaintiffs urged the Court to hold that if a property owner modifies his or her property in a manner that creates a hazard without promoting or preserving the recreational character of the property, then immunity does not apply. The Ohio Supreme Court disagreed.

**{¶27}** Because the statute provides that "no owner owes any duty" to any recreational user, the Court concluded that an owner of recreational property cannot be liable for injuries sustained during recreational use "even if the property owner affirmatively created a dangerous condition." *Id*. at ¶ 47. Thus, the City's alleged creation of a hazard on the premises did not affect its immunity. *Id*. Thus, if a government entity owner opens their land to the public free of charge and the owner takes some action, or fails to take some action, and later it is determined to have created a dangerous condition, the owner remains immune as long as the property qualifies as recreational property, and the user qualifies as a recreational user. *Id.* To this point, the *Pauley* court stated:

> Under R.C. 1533.181(A)(1), "[n]o owner owes *any duty* to a recreational user to keep the premises safe for entry or use." (Emphasis added.). A duty is "[a] legal obligation that is owed or due to another and that needs to be satisfied." *Black's Law Dictionary* 580 (9th Ed.2009). Generally speaking, "[i]f there is no duty, no liability can follow." *Collins v. Sabino,* 11th Dist. Trumbull No. 96-T-5590, 1997 WL 531246, *4 (Aug. 29, 1997), fn. 5. Consequently, an owner cannot be held liable for injuries sustained during recreational use "even if the property owner affirmatively created a dangerous condition." *Erbs v. Cleveland Metroparks Sys.,* at *2.
>
> * * *

The determination of whether R.C. 1533.181 applies depends not on the property owner's actions, but on whether the person using the property qualifies as a recreational user.

*Pauley*, ¶¶ 19-21, citing *Estate of Finley v. Cleveland Metroparks,* 2010-Ohio-4013, ¶ 50 (8th Dist.); *Look v. Cleveland Metroparks System,* 48 Ohio App.3d 135, 137 (8th Dist. 1988).

### *1985 Political Subdivision Tort Liability Act did not abrogate and does not conflict with R.C. 1533.181*

{¶28} The 1985 Political Subdivision Tort Liability Act was enacted in 1985 in response to the State's waiver of immunity. Specifically, R.C. Chapter 2744.02(A)(1) provides that political subdivisions are not liable for injuries caused by negligence in connection with governmental functions. Section (A)(2) states that, "[t]he defenses and immunities conferred under this chapter apply in connection with all governmental and proprietary functions performed by a political subdivision and its employees, whether performed on behalf of that political subdivision or on behalf of another political subdivision." The term "governmental function" includes a political subdivision's "design, construction, reconstruction, renovation, repair, maintenance, and operation ... of any recreational area or facility, including but not limited to ... [a] park, playground, or playfield." R.C. Chapter 2744.01(C)(2)(u)(i).

{¶29} Political subdivisions are therefore not liable for injuries caused by negligence in connection with their recreational areas unless one of five enumerated exceptions apply as set forth in R.C. Chapter 2744.02(B). Even if an exception under section (B) applies, the political subdivision can assert additional defenses and immunities under R.C. Chapter 2744.03, including section (A)(7) stating the political

subdivision is entitled to any defense or immunity available at common law or established by the Revised Code.

**{¶30}** Appellants maintain on appeal that (1) R.C. Chapter 2744 abrogated common law derivative recreational user immunity for political subdivisions and replaced it with direct statutory immunity; and/or (2) R.C. Chapter 2744 conflicts with derivative statutory immunity to the extent that R.C. Chapter 2744 must prevail. Appellants rely on two cases to support their position, namely *Est. of Graves v. Circleville,* 2010-Ohio-168, and *Argabrite v. Neer,* 2016-Ohio-8374. Thus, because R.C. Chapter 2744 controls, Appellants contend that issues of fact exist pursuant to an immunity exception under R.C. Chapter 2744.02(B).[4] Appellants' position is not well-taken and runs counter to long-standing Ohio precedent.

**{¶31}** Indeed, Ohio courts at every level have consistently applied said immunity well after the enactment of R.C. Chapter 2744. *Stone v. Northmont City Schools,* 2022-Ohio-1116 (2nd Dist.); *Farris v. Mill Creek Metropolitan Park District,* 2023-Ohio-1214 (7th Dist.); *Tomba,* supra,; *Moskalik v. Mill Creek Metroparks,* 2015-Ohio-4826 (7th Dist.); *Boggs, et al. v. City of Bowling Green, et al.,* 2003-Ohio-4093 (6th Dist.); *Estate of Finley, et al. v. Cleveland Metroparks, et al.,* 2010-Ohio-4013 (8th Dist.); *Mason v. Bristol Local School Dist. Bd. of Ed.,* 2006-Ohio-5174 (11th Dist.). Each of the above cases applied common law derivative recreational user immunity to a political subdivision despite the existence of R.C. Chapter 2744.

---

[4] Section (B)(4) states that political subdivisions remain liable for injury, death, or loss to persons or property that is caused by the "negligence of their employees" and said negligence occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function.

**{¶32}** The trial court correctly noted, "[w]hile there may be overlapping protection in the recreational user immunity statute as applied by governmental entities and the Political Subdivision Tort Liability Act, the purpose of the two statutes is clearly the same; an effort to limit the taxpayers' exposure to liability. The two statutes in question are not in conflict. Instead, both serve the same purpose." See *Kendrick, et al. v. Cleveland Metroparks Bd. of Commrs.*, 102 Ohio App.3d 739 (8th Dist. 1994) (holding that R.C. Chapter 2744 did not overrule common law derivative recreational user immunity as applied to recreational users of recreational premises), citing *Harman v. Fostoria*, 1994 WL 50259 at *5 (6th Dist.) (stating "R.C. Chapter 2744 was the legislative response to the judicial abolition of sovereign immunity for municipalities * * *. While there may be overlapping protection in the recreational use immunity as applied to governmental entities and the Political Subdivision Tort Liability Act, the purpose of the two statutes is clearly the same: an effort to limit the taxpayers' exposure to liability."); see also *Herrington v. Boyas Excavating, Inc.*, 992 F.2d 1216 (6th Cir. 1993). As noted in *Harman*, the Ohio Supreme Court has yet to overrule its reasoning in *Marrek* that recreational use immunity extends to governmental entities.

**{¶33}** The *Kendrick* case involved devastating facts but remains instructive and on point. Three children were playing near Euclid Creek in the Euclid Creek Reservation of the Cleveland Metroparks System. Appellant brought the children to the park for a picnic and the children went to play in the creek. One minor child subsequently drowned in a small pool of water in the creek. Two other children were also injured. Appellant sued on behalf of her deceased daughter and several other plaintiffs alleging that the Cleveland Metroparks Board of Commissioners violated R.C. Chapter 2744.

**{¶34}** The complaint asserted that appellees were negligent, careless, reckless and wanton in their failure to safely maintain, service and/or repair, or warn the public about, the dangerous and hazardous condition in the park. Appellees raised the defense of derivative statutory immunity under the recreational user provision, R.C. 1533.181, in a motion for summary judgment, which the trial court granted. Like the Appellants in this case, the *Kendrick* appellants maintained that R.C. Chapter 2744 provided the exclusive avenue under which political subdivisions are entitled to immunity and that the provisions of R.C. Chapter 2744 conflict with those of the recreational user statute. The Eighth District Court of Appeals rejected the argument, stating:

> We do not agree that the intent of the legislature was to overrule the immunity provided to political subdivisions by judicial decisions when it passed legislation further extending immunity to that class of defendants. In fact, under R.C. Chapter 2744.03(A)(7) the legislature specifically stated: 'The political subdivision * * * is entitled to any defense or immunity available at common law or established by the Revised Code.'
>
> *Id.* at 742.

**{¶35}** The *Kendrick* opinion cites cases that likewise concluded the language of R.C. Chapter 2744.03(A)(7) is direct evidence of the legislative intent to continue application of common law derivative recreational user immunity to political subdivisions. *Id*. at 743, citing *Harman,* supra, at *3, 5; *Herrington,* 992 F.2d at *4. This Court agrees that the inclusion of the specific language in (A)(7) cannot be understated and is further indication that R.C. Chapter 2744 provides overlapping immunity for political subdivisions rather than abrogating derivative recreational user immunity.

{¶36} The General Assembly is presumed to have been familiar with both the recreational user statute, and the Supreme Court of Ohio's jurisprudence regarding same, when it passed R.C. Chapter 2744. See *State ex rel City Bd. of Edn. v. Howard,* 167 Ohio St. 93 (1957) (the legislature is presumed to be aware of the judicial construction placed on an existing statute when it enacts an amendment); *State v. Mower,* 15 Ohio St.3d 239, 254 (1984) (the legislature is presumed to be cognizant of all prior sections of the Code); *Crossbridge, Inc. v. Shank,* 74 Ohio App.3d 779, 784 (10th Dist. 1991). In the final analysis, the Supreme Court of Ohio has extended recreational user immunity to political subdivisions for decades. Had Ohio's General Assembly intended to change this line of cases, it would have expressly said so in its enactment of R.C. Chapter 2744 and excluded any common law immunity from R.C. Chapter 2744.03. It did not. R.C. Chapter 2744.03(A)(7) expressly and broadly encompasses "any" defense or immunity available at common law or established in the Revised Code. Thus, the Court finds that R.C. Chapter 2744 and R.C. 1533.181 provide overlapping immunity to political subdivisions and do not conflict with each other.

### Appellees the City and Marshall are entitled to common law derivative recreational user immunity

{¶37} The City contends that Seltzer Park, including the south restroom, meets the definition of "premises" under R.C. 1533.18(A), that C.F. was a "recreational user" under R.C. 1533.18(B) at the time of his injury, and that the injury to C.F. was caused by a condition/defect of the premises. Thus, pursuant to R.C. 1553.181(A)(1), the City owed no duty to C.F. to keep the premises safe for entry or use. Similarly, Marshall argues he is entitled to the same immunity as an employee of the City because he was acting within

the scope of his employment, regardless of who installed, reinstalled, or reattached the hand dryer.[5]  We agree.

**{¶38}**  First, there can be no serious dispute that the property at issue is a city park owned and operated by the City, and said park is open to the public for recreational use and pursuits.  This park, like many other parks, contains a playground, disc golf, a playscape, picnic tables, and other recreational facilities.  The essential character of Seltzer Park is meant for recreational pursuits.  Thus, Seltzer Park meets the definition of "premises" under R.C. 1533.18(A).  Such "premises" made available for recreational users meets the statutory requirements for immunity from liability, including political subdivisions, like the City.  *Johnson v. New London*, 36 Ohio St.3d 60 (1988).

**{¶39}**  Second, C.F. attended a school field trip that concluded at Seltzer Park, free of charge, where he ate lunch and played on the playground with his friends and classmates.  Clearly, the individuals who attended the field trip at the park, including C.F., meet the definition of "recreational user" under R.C. 1533.18(B).  If a person qualifies as a recreational user, the premises' owner has no duty to keep the premises safe for entry or use and extends no assurances through the act of giving permission that the premises are safe for entry or use. R.C. 1533.181(A); *Ryll v. Columbus Fireworks Display Co., Inc.*, 2002-Ohio-2584, ¶ 15 (holding that statute did not provide immunity under the facts of the case).

**{¶40}**  Third, and finally, the alleged defect in this case is a hand dryer in the south restroom at Seltzer Park. Like the railroad tie in *Pauley,* the hand dryer's missing

---

[5] The trial court found that because Marshall's actions were within his scope of employment, he is similarly cloaked with immunity. *Rankey v. Arlington Board of Education,* 78 Ohio App.3d 112 (3rd Dist. 1992).  Appellants do not discuss this issue in detail on appeal but rather, summarily claim the trial court improperly granted summary judgment to the City and Marshall.

protective guard does not change the essential character of the park. The restroom is part and parcel of the park's "premises" that was designed for public recreational use. *Pauley*, ¶ 37. C.F.'s injuries occurred when he used the park's restroom during recreational activities. R.C. 1533.18(A) makes clear that the restroom is considered part of the "premises" for immunity purposes as the statute specifically includes "any buildings or structures thereon the land." *Mitchell v. Blue Ash*, 2009-Ohio-1887, ¶¶ 8, 12 (holding that city had recreational-user immunity from liability arising out of accident in which park employee opened the gate and the visitor's finger was caught under gate's rolling mechanism; the gate was a part of the park premises); *Stone v. Northmont City Sch.*, 2022-Ohio-1116, ¶ 38 (holding that rope strung by school district employee across bike trail was condition of premises for purposes of recreational user statute, and thus, under statute governing political subdivision's immunity, district and its employee were immune).

{¶41} As noted by the *Combs* court, the Supreme Court's jurisprudence mandates that the recreational user statute precludes liability for injuries arising from a "condition of the premises," i.e., the lands, ways, and waters, and any buildings or structures thereon, or from the acts of another recreational user. *Combs at* ¶ 16 (holding the recreational user statute did not apply to visitor's eye injury arising after ODNR employee's allegedly negligent operation of boom mower; injury did not arise from the condition of the premises but rather, one of the mower blades "hit the riprap—stones placed along the waterline to prevent erosion—and threw a rock that struck Combs in the eye and face and caused serious injuries); *contra Pauley*, ¶ 32 (holding that the sledder's tragic injury was caused by a defect in the premises and the city was entitled to derivative recreational user immunity).

**{¶42}** Undoubtedly, common law derivative recreational user immunity can lead to harsh results. Appellants understandably wish to hold someone responsible for the tragedy that occurred on May 10, 2022. Although this Court is sympathetic, we are bound to follow well-established Ohio precedent. Because no genuine issue of material fact exists as to whether the City and its employee Marshall are entitled to immunity, the trial court's grant of summary judgment to both was proper. As such, it is unnecessary to address the City and Marshall's specific immunity, or lack thereof, pursuant to R.C. Chapter 2744.

### *Defendants Staffing Partners and William Bland*

**{¶43}** Defendant Bland is employed through Staffing Partners to work for the city's parks. At the start of the workday, Bland and other workers meet in the "office" located in Seltzer Park and receive a work itinerary from Marshall for the day. Defendant Bland has worked part-time for the park for the past nine years as a maintenance man. Chew is also employed through Staffing Partners to work for the park. Chew works as a groundskeeper for the park. Appellants claim that issues of fact exist as to whether Bland was negligent in reattaching the subject hand dryer two weeks prior to the incident, and whether Bland was acting in the scope of his employment with Staffing Partners. Appellants argue that Bland is an independent contractor, not a city employee, and does not and should not receive any immunity.

**{¶44}** Staffing Partners and Bland maintain that the loaned servant doctrine immunizes Staffing Partners from liability because the City and Marshall, rather than Staffing Partners, had complete control over Bland's actions while he was performing maintenance work in Seltzer Park. The trial court concluded that: "[t]here is no genuine

issue of material fact to be determined at trial regarding Defendant Bland's employment status as a loaned employee of Defendant Shelby at the time of the reinstallation of the hand dryer and [C.F.'s] injury." Consequently, under the loaned servant doctrine, Staffing Partners could not be held liable for Bland's action as a matter of law. We agree with the trial court.

**{¶45}** "Under the loaned servant doctrine, when one party lends his employee to another for a particular employment, the employee, for anything done in that employment, is treated as the employee of the party to whom he is loaned." *Crew v. Advics Mfg. Ohio, Inc.,* 2020-Ohio-328, ¶ 23 (12th Dist.). "This doctrine is based on the premise that an employee may have more than one employer while doing a specific act." *Id.* "Though the employee remains the general servant of the party who has loaned him, since the question of liability is always predicated upon some specific act of the servant, it is not important whether he remains the servant of the general employer as to matters generally, but whether, in performing the act in question, he is acting in the business of and under the direction of the general employer or that of the temporary employer." *Medina v. Harold J. Becker Co.,* 2005-Ohio-5438, ¶ 57 (1st Dist.) (stating that under the loaned-servant doctrine, when one party lends its employee to another for a particular employment, the employee, for anything done in that employment, must be dealt with as the employee of the one to whom he has been loaned); citing *Halkias v. Wilkoff,* 141 Ohio St. 139 (1943), paragraph four of the syllabus, *overruled on other grounds* in *Helmick v. Republic-Franklin Ins. Co.,* 39 Ohio St.3d 71 (1988).

**{¶46}** Further, "[i]n determining whether an employee became a loaned servant, the inquiry should focus on the question of control." *Crew, supra* at ¶ 23. The focus is

"whether the general employer has retained direction and control over the employee, or whether, with respect to the particular act or acts resulting in tort liability, the control of the employee has passed to the borrowing employer with reference not only to the result reached but to the method of reaching it." *Id.;* citing *Ferguson v. Dyer,* 2002-0hio-1442, ¶ 15 (10th Dist.).

**{¶47}** Indeed, this Court has held the company who retained "day-to-day" oversight of the employee's workplace matters is "dispositive" regarding which company the employee belonged to for purposes of liability. See e.g., *Carrico v. Drake Constr.,* 2006-Ohio-3138 (5th Dist.) (finding that subcontractor's employee was a loaned servant to the general contractor for purposes of liability from a fatal injury; general contractor exercised full control over the employee's work that day and instructed employee concerning the specific floors to be cleaned and the manner in which debris was to be removed); see also *Kinderdine v. Mahoning Cty. Bd. of Dev. Disabilities,* 2016-Ohio-4815, ¶ 31 (7th Dist.) (finding that staffing agency could not be held liable for employee's conduct because the company to which the employee was loaned was responsible for the supervision and direction of the employee's day-to-day work duties). "The test is whether while performing the task, the employee continues to be liable to the direction and control of the general employer, or becomes subject to that of the person to whom he is lent." *Carrico,* ¶ 24.

**{¶48}** Here, while Bland was technically an employee of Staffing Partners at the time of the injury, Bland was under the complete direction and control of Marshall and the City. Indeed, Marshall testified that he was responsible for directing and supervising Bland's daily work, and Marshall was the person to whom Bland reported:

Q. Before we get into that, do you consider yourself the supervisor of Rich and [Bland]?
A. Yes.
Q. And you direct their work, correct?
A. Yes.
Q. Do you supervise their work to make sure they're doing their job?
A. Yes.
Q. They report directly to you?
A. Yes.

*Marshall Depo Tr.* at p. 101.

{¶49} Additionally, Bland worked out of the maintenance building located at Seltzer Park and reported to that building to receive his duties for the day.

Q. Okay. And when you said your office, is that the maintenance building? Is that the building at Seltzer Park?
A. Yes.
Q. Okay. And that's where you consider your office?
A. Yes.
Q. And that's the office that Rich and Bill and the other park workers use?
A. Yes.
Q. Is that where all the equipment and supplies are kept?
A. Either in there or close by, yeah.

*Id.* at pp. 102-103.

{¶50} The equipment Bland used to perform his daily groundskeeping and maintenance duties is owned by the City:

Q. Okay. And Rich and Bill, when they do the mowing, they're using city machinery?
A. Yes.
Q. And all the equipment that they use for their jobs is a city-owned equipment?
A. Yes.

*Id.* at p. 103.

{¶51} Furthermore, Bland confirmed that his day-to-day duties are solely provided by Marshall:

Q.      And how do you decide what to do each day? Does Jerry call you? Do you just have a feel for it now? How does it work?
A.      We're all in the office in the morning, and if he has something special he wants us to do, that's what -- we do it that way. Go through what he says.
Q.      So you meet at the office first thing every morning?
A.      Right.
Q.      And Jerry gives you the itinerary of what to do for the day?
A.      Right.

*Bland Depo. Tr.* at p. 13.

**{¶52}** Appellants essentially disregard the loaned servant doctrine and suggest that Bland's status as an independent contractor is dispositive of Staffing Partners' potential liability. However, as Staffing Partners suggests, this approach ignores the purpose and substance of the loaned servant doctrine, which is controlling in this case. The record unequivocally demonstrates that the only conduct giving rise to the claim against Bland and Staffing Partners was performed at the direction of Marshall and the City. Since Marshall and the City directed Bland's day-to-day workplace duties, the loaned servant doctrine precludes liability against Staffing Partners. As noted by several Ohio courts, an employee can remain as an employee of a general employer while simultaneously being a loaned employee to another.

**{¶53}** Bland, in his capacity as a loaned servant, was working as an agent, employee, and servant of the City. He reported daily to the City, received tasks and assignments from it, and generally acted in the business of and under the direction of the City, not Staffing Partners. Thus, Bland is entitled to the same recreational user immunity as Marshall. Moreover, the record is also devoid of any evidence, or allegation, that Bland acted with "malicious purpose, in bad faith, or in a wanton or reckless manner" such that the immunity afforded to him under R.C. Chapter 2744.03(A)(6) is precluded.

## CONCLUSION

{¶54}  For the reasons set forth in this opinion, Appellants' sole assignment of error is overruled, and the judgment of the Richland County Court of Common Pleas is affirmed in its entirety.

By: Montgomery, J.

King, P.J. and

Gormley, J. concur.